**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**

Randy Wilkinson,                  )
                                  )
                Plaintiff,        )        **ORDER RE CROSS-MOTIONS**
                                  )        **FOR SUMMARY JUDGMENT**
        vs.                       )
                                  )
Nancy A. Berryhill, Acting        )        Case No. 1-17-cv-147
Commissioner of Social Security   )
Administration,                   )
                                  )
                Defendant.        )

_____

      Plaintiff Randy Wilkinson seeks judicial review of the Social Security Commissioner's denial

of his application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act,

42 U.S.C. § 401– 433, *et. seq.* Before the court are competing motions for summary judgment filed

by Wilkinson and Nancy A. Berryhill, Acting Commissioner of Social Security Administration

("Commissioner"). (Doc. Nos. 13, 15).[1]

## I.    BACKGROUND

### A.    Procedural History

      Wilkinson filed an application for DIB on June 23, 2015, alleging a disability onset date of

March 4, 2014. (Tr. 173–179). Wilkinson later amended the alleged onset date to March 5, 2015.

(Tr. 35). An Administrative Law Judge ("ALJ") held a hearing on Wilkinson's application on

December 7, 2016, at which counsel represented Wilkinson. (Tr. 30–72). On February 9, 2017, the

ALJ issued a decision concluding Wilkinson was not disabled so as to be entitled to DIB. (Tr.

_____

[1] The court will refer to all documents filed in this case by their docket numbering. However, for simplicity's sake, the court will refer to all documents filed in the administrative proceeding, filed at Doc. No. 9, by the page number given in that proceeding, which the court will cite as (Tr.).

11–22).  Wilkinson appealed that determination to the Appeals Council on April 6, 2017.  (Tr. 325-330).  The Appeals Council, without analysis, denied the appeal on May 16, 2017, concluding no basis existed so as to warrant changing the ALJ's determination.  (Tr. 1–4).  Wilkinson filed his complaint initiating this action on July 19, 2017.  (Doc. No. 4).

### B.     General Background

As of his administrative hearing, Wilkinson was 50 years old, stood 5-11 feet tall, and weighed approximately 320 pounds.  (Tr. 818).  Wilkinson has a GED and completed two years of post-secondary education.  (Tr. 39).  For the majority of his adult life, Wilkinson worked as a mechanic at various employers in southwestern North Dakota.  (Tr. 39–44).

### C.     Medical and Other Records

Wilkinson suffers from a number of ailments, either in isolation or in combination, that he claims renders  him disabled within the meaning of the Social Security Act.  The following broadly and separately outlines the roughly 700 pages of medical records appearing in the record with respect to the principal matters at issue in this case.  (Tr. 331–994).

#### 1.     *Lower back and leg*

Wilkinson suffers from degenerative disc disease in his back, with accompanying lower extremity radicular pain. (Tr. 969–970).  Wilkinson began experiencing low back and right-sided sciatica at least by mid-2013.  At that time, medical imaging suggested an L4-L5 right-sided small disk herniation.  He was seen on a number of occasions in 2013 in an attempt treat the pain with medication and injections.  According to the reports, the injections provided only temporary relief.  During this period, Wilkinson continued to work for Peterbuilt.  He reported having received a promotion that allowed him to do more counter work and less physical work.  (Tr. 679–694).

After the attempts to address the back and leg pain with injections and medication were not successful and following additional MRI imaging showing evidence of L4-L5 right-sided lateral recessed stenosis, Wilkinson elected to undergo a decompression surgery on March 13, 2014, performed by Dr. Belanger. (Tr. 380, 675– 677). Medical notes taken at follow up appointments suggested the surgery provided good decompression of the L4-L5 area. On May 9, 2014, Wilkinson reported that he had obtained significant relief, was ready to return to work, and inquired about restrictions. At that time, it was suggested he continue to lift not more than 20 pounds and avoid repetitive twisting and turning until he was twelve weeks post op, at which time he could resume his normal activities. He was cleared to return to work as of May 12 subject to these temporary restrictions. (Tr. 674–75).

Shortly thereafter, however, Wilkinson reported that the pain in his back returned following a pillow fight with his son and that he twice went to the emergency room for relief. At that point, Dr. Belanger and his assistants urged he continue with conservative treatment options and attend physical therapy. (Tr. 672–675).

Wilkinson did return to work at some point but continued to present with complaints of pain. In September 2014, there is a clinic note in which Wilkinson reports fluctuating pain in his lower back and right buttocks. He stated the symptoms were aggravated by changing positions and daily activities. He also stated that he had to get help the day prior at work in getting up from his "creeper" because of intense burning. (Tr. 874). Wilkinson sought a second opinion for the pain he was still experiencing and was referred to Dr. Watt. (Tr. 879).

On October 14, 2014, Wilkinson had a neurosurgical consult with Dr. Watt. According to the notes of the physician assistant, Wilkinson reported that he had obtained some relief for a couple

of weeks after the surgery in March 2014, but that the pain returned along with numbness in his right buttocks, rectal area, and the back of his right leg. Wilkinson reported the pain was intermittent and that there had been a few instances of sharp pain in which he lost a little bit of stool in his underwear. Wilkinson stated his symptoms were aggravated by lying on his "creeper" at work or doing any activity on his back and that he had missed one day of work. He believed his condition overall was worsening and that Dr. Belanger had advised there was nothing more that he could do. Following a physical examination that revealed little in the way of objective information, the decision was made to obtain additional studies, including a nerve conduction study that was performed that same day and revealed remote right LS-S1 radiculopathy. (Tr. 654–659, 859–861).

Following an additional telephone contact on December 10, 2014, in which Wilkinson continued to complain about pain with twisting and turning at work, it was decided that new MRI imagery should be obtained. (Tr. 652). The new MRI administered in February of 2015 showed moderate to severe spinal canal stenosis at the L4-S1 levels. (Tr. 859–861, 869–872). On March 6, 2015, Wilkinson had a followup and the treatment notes reflect that Dr. Watt could not clearly identify the reason for the continued pain but concluded it may be due to epidural lipomatosis as well as possibly trauma from the root retraction during his earlier discectomy. The only thing that Dr. Watt offered was that he could increase the size of the decompression, but with no guarantee this would provide any relief. (Tr. 449–650).

While the record is not entirely clear, it appears Wilkinson continued to work as his medical condition permitted until March 15, 2015, when he quit because he re-injured his left hand. After another surgical procedure on his left hand in April 2015, followed by a second surgical procedure in July 2015 on his back that ultimately did not provide lasting relief, Wilkinson never returned to

work, concluding he was not able to do so given his back and hand/arm impairments. (Tr. 39–41, 45).

On June 5, 2015, Wilkinson called Dr. Watts' office to report a "worsening of left leg pain that radiates from his low back down [through] his lateral thigh to the knee" and that the pain was "so bad he [couldn't] sleep." (Tr. 648). This was followed by a decision to get a new updated MRI study, which was conducted on June 30, 2015. The study showed a loss of intervertebral disc space height and disc displacement at L1-L2; moderate left greater than right foraminal narrowing effacing the exiting L2 nerve root at L2-L3; broad based disc protrusion and moderate biformainal narrowing effacing the exiting L3 nerve root in combination with facet arthropathy at L3-L4; and mixed spondylotic disc displacement eccentric to the left and moderate foraminal narrowing effacing the exiting L4 nerve root in combination with facet arthropathy at L4-L5. Dr. Watt, who saw Wilkinson the same day as the new study, noted "progressive worsening of his pain despite attempts at conservative care" and that the pain "worsens with standing." Dr. Watt also noted that Wilkinson had gained weight from when he was in last and that he needed to lose weight and improve his overall health. The decision was made to put him on the schedule for surgery. (Tr. 641–643).

On July 22, 2015, Dr. Watt performed a decompression "by way of laminectomy and foraminotomy," at the L2, L3, L4, and L5 nerve roots. (Tr. 553–554, 630–631). A month after the surgery Wilkinson was seen for a followup. Wilkinson reported that his low back was sore, but that he was pleased with the surgery. He stated he was not sure he could return to heavy work in the oil fields, however, and he was continued on narcotic pain medications. (Tr, 635–636).

On September 23, 2015, during a call for a refill of his narcotic pain medication, Wilkinson reported that he continued to have pain in his tailbone but his radicular pain at that point was not

present and that overall his back was feeling pretty good. The decision was made to continue him on the narcotic pain medication but start to wean him off. (Tr. 633).

In a subsequent call in October, however, Wilkinson reported that his pain had returned and his back was "really messed up." He was referred for long-term pain management. (Tr. 632). In the interim, he was continued on his narcotic pain medication. (Tr. 632, 914–917).

Wilkinson started with Sandford Health in December 2015 for pain management. During his first visit on December 3, 2015, Wilkinson addressed his low back pain and left wrist pain. He stated that his low back pain is "always present[]" and made worse with longer periods of walking, sitting, and standing. (Tr. 951). From this first visit in December 2015 through November 2016, just before the hearing before the ALJ in December, Wilkinson was seen at least five different times for his pain management. During this period, he also had an additional procedure on his left hand. Although there were concerns about Wilkinson remaining on narcotic pain medication long term, he continued to be treated with narcotic pain medication for his back and left wrist pain. And, while Wilkinson was satisfied with the pain regime he was on up to October 2016, his physical activity remained limited and the reports reflect that the pain would increase during longer periods of walking, sitting, or standing. (Tr. 951–985). Also, when he was seen on August 19, 2016, the treating physician for his pain management, Dr. Ryan Zimmermann, diagnosed his condition as being one of "failed back syndrome." (Tr. 969).

In October 2016, Wilkinson reported to his Sandford pain management team that his level of pain had increased. A change was made in his narcotic pain medication from hydrocodone/apap 10/325 to oxycodone/apap 10/325 mg and Wilkinson was re-started on physical therapy. At the next visit in November 2016, Wilkinson reported that his current pain regime was helping and he was

continued on "chronic opioid maintenance therapy." Wilkinson also reported that physical therapy helped a little in that he felt good on the day of the PT but that the pain would return by the next day. (Tr. 981–985).

Wilkinson's treating professionals have expressed concern about his obesity and the fact that it might be exacerbating or least not helping his back pain. During the time period from 2013 through 2016 when Wilkinson's physical activity became more and more restricted with his low back and arms problems, he put on more than 100 pounds. The problem of Wilkinson's obesity may be a complex one, including lack of physical activity, diet, periods of depressed feelings, and hypothyroidism. (Tr. 376, 752, 886, 956, 969).

### 2. *Left wrist/hand*

At an October 2, 2014 presentment, a treating physician diagnosed Wilkinson with a ruptured ligament in his left wrist. (Tr. 586–587). Wilkinson underwent a radioscapholunate arthodesis for radiolunate arthritis on November 7, 2014. (Tr. 395–396). This provided some relief for his radiocarpal joint, but Wilkinson had developed other significant symptoms over the distal radial ulnar joint, which was also arthritic. (Tr. 397). Wilkinson underwent a radioscapholunate fusion on April 15, 2015. (Tr. 397–398). Wilkinson presented for a number of follow-up appointments in the following months. (Tr. 616–623). During a September 3, 2015 appointment, Wilkinson reported he was doing well and not having any pain. He reported he was adjusting to his new limitations and was using his left hand "for most activities." (Tr. 623). The receiving nurse advised Wilkinson he should not be lifting more than twenty pounds but he could begin doing light, sedentary work as tolerated. (Tr. 623). On October 1, 2015, Wilkinson reported limited motion in his wrist, but could wiggle his fingers, make a fist, and fully extend his fingers. (Tr. 627).

Following a nerve conduction study on May 5, 2016, the treating physician noted Wilkinson had mild carpal tunnel syndrome in his left wrist. (Tr. 811). At that time, he received injections in his left thumb carpometacarpal joint, which he again received two months later. (Tr. 811). Wilkinson had hardware from his fusion surgery removed on July 28, 2016, because it was creating issues. (Tr. 816). Wilkinson also underwent a left thumb trapeziectomy at that time. (Tr. 816).

### 3. *Right wrist/hand*

Wilkinson is right hand dominant. (Tr. 64). Wilkinson has had varying degrees of problems with his right wrist since the early 1990's, when he received a worker's compensation award for an injury to that wrist. (Tr. 331--333).

An x-ray of the right wrist taken at a March 5, 2015 presentation indicated "significant ulnar positive variance. He has got deformity of the radius, as well as significant radiolunate arthritis." (Tr. 353, 612). The treating physician noted Wilkinson had developed "progressive difficulty with his right wrist" and assessed Wilkinson as having right "wrist arthritis with ulnocarpal impaction syndrome." (Tr. 353, 612).

On March 5, 2016, during a followup with respect to a surgery on his left wrist, the treating physician noted that: Wilkinson had "some swelling over the [right] wrist. There is some tenderness about the radiocarpal joint." The physician continued: "EMG's do show that he has got pretty mild carpal tunnel syndrome on the right" wrist. (Tr. 811).

On another followup with respect to his left wrist, Wilkinson's treating physician noted with respect to the right wrist that Wilkinson "has intermittent flaring of his symptoms. . . Continue[s] to have aching pain primarily over the ulnar aspect with decreased motion and discomfort." (Tr. 812). He continued: "Examination of his right wrist, he has a prominent ulna. Tenderness over the

[distal radioulnar joint]. Pain with any range of motion at all. He has limited motion, reasonable strength and sensation." (Tr. 812). The treating physician then reiterated his prior diagnosis of the right wrist, stating that the x-ray imaging indicated Wilkinson had significant lunate facet arthritis with significantly positive ulnar variance with ulnar impaction. (Tr. 812). The physician concluded by discussing the possibility of Wilkinson needing surgery on the right hand to preserve motion and provide longevity in the wrist. (Tr. 813).

### 4. Mental health

At various times, Wilkinson also reported to medical personnel he felt depressed. A September 4, 2013 report indicated Wilkinson presented for treatment "with depressed mood . . . ." (Tr. 451). A February 25, 2014 medical report indicated the same. (Tr. 443).

After Wilkinson filed for SSA benefits, he was referred to an SSA consultant, Ed Kehrwald, Phd., for an in-person assessment that was conducted on December 17, 2015. Dr Kehrwald reported that, although Wilkinson stated he had depression stemming from his inability to work, he "did not list many symptoms" beyond reported anxiousness that distraction could abate. (Tr. 744). The report further noted that, although Wilkinson had a history of mild anxiety and social anxiety, there "was no evidence for current problems with conduct, hostility, paranoia, or thought disturbance." (Tr. 746). On the whole, Dr. Kehrwald diagnosis was unspecified anxiety disorder with a few depression symptoms, social anxiety, and initial insomnia and interrupted sleep. (Tr. 743–746).

On August 19, 2016, Wilkinson reported to Dr. Zimmerman, his pain specialist, that he felt anxious and depressed and that the Zoloft he was being prescribed was not helping him much. Dr. Zimmerman's report stated that Wilkinson was "positive for decreased concentration, dysphoric mood, and sleep disturbance." Dr. Zimmerman recommended that Wilkinson return in about four

weeks for further medication management and "Anxiety/Depression." (Tr. 969). Other reports during 2016 also suggest that Wilkinson was positive for depression, but on most of the occasions he did not appear to be nervous or anxious. (Tr. 951–985).

### D.    Administrative Hearing

The ALJ conducted a hearing on Wilkinson's application on December 7, 2016. (Tr. 30). Two people testified: Wilkinson and a vocational expert. The ALJ examined Wilkinson first.

The ALJ began by probing Wilkinson's daily activities. Wilkinson testified he maintains a drivers license and drives "a couple times a week" in dropping his children off at school, running errands, "or something just to get out of the house." (Tr. 38). Wilkinson also testified to traveling to Dickinson, North Dakota every two to three weeks to shop. (Tr. 38)).

As to education, Wilkinson testified that he received his GED. (Tr. 38). He further testified that he took some college level programming, but he did not receive any diploma or certificate. (Tr. 39).

The ALJ proceeded to ask Wilkinson about his ailments. Asked about the cause of his mobility issue, Wilkinson testified he has leg and back pain everyday. (Tr. 45). Wilkinson testified his present pain came about after his July 2015 surgery. (Tr. 45). Such pain, though variable on a daily basis, could be severe to the touch at times. (Tr. 45–46). Wilkinson stated that he must often lay in bed for an hour or so before getting up in the morning so as to allow his narcotic medication to dull his pain. (Tr. 53, 61). Once risen, Wilkinson stated his pain causes him to walk in a self-described "waddle" fashion, (Tr. 47), and precludes him from walking significant distances. (Tr. 54). He testified that he when he does go shopping he often has to find a place to sit after a short period of time and that there have been times when, shopping with his wife, he had to return to the

pickup. (Tr. 53–54, 57–58). Wilkinson testified he had recently begun physical therapy, which alleviated his leg and back pain, but only temporarily. (Tr. 63).

As to his hands, Wilkinson testified he suffers from conditions in both hands and wrists, which compound his mobility issues by causing him difficulty in rising from a sitting or laying position. (Tr. 46). Regarding his left hand, Wilkinson testified that he cannot use that hand to care for himself on issues as basic as toilet hygiene. (Tr. 48). He testified that his left thumb has nerve damage and a severed bone, which results in him dropping things quite frequently. (Tr. 48). With the fusion of his left wrist, Wilkinson testified he has difficulty using a keyboard because he cannot turn his hand side-to-side. (Tr. 48–49). Regarding his right hand, Wilkinson testified that he had a metal plate inserted in the wrist a number of years prior. (Tr. 51). He indicated that his right wrist was in need of a surgery similar to the fusion surgery performed on his left wrist. (Tr. 51). He testified that, although he might be able to use a wrench with his right hand, he could do so only momentarily before the wrist would start swelling. (Tr. 60). Wilkinson testified that he was trying to avoid surgery on his right wrist as long as possible to maintain what articulation remains in that hand. (Tr. 51-52). One of his primary concerns was retaining the ability "to wipe myself" after going to the toilet, something that he cannot do with his left wrist and hand. According to Wilkinson, his wrist problems have prevented him from lifting twenty pounds or more for approximately three years. (Tr. 59). He also testified that, because of his wrist problems, he lacks the dexterity to tie his shoelaces, so he wears slip-on shoes. (Tr. 49–50).

Wilkinson testified that his ailments limit what he can do on a daily basis. He testified that he spends much of his day on the couch watching television. (Tr. 55). Pain permitting, Wilkinson testified that he prepares simple dinner meals for his family, although even that takes the better part

of the afternoon with his limitations. (Tr. 56). Wilkinson testified that he is unable to perform various personal hygiene tasks; he cannot perform laundry, vacuuming, sweeping, or other homemaking tasks of the like; and he cannot hunt or fish. (Tr. 57-58).

The ALJ next questioned a vocational expert (VE). The ALJ posited a number of hypotheticals to the VE about the availability of employment for an individual with varying degrees of functional capacity.

One sequence of hypotheticals assumed the individual is capable of performing some light work, including standing or walking for six hours in an eight-hour work day. What was varied were the assumptions regarding the functional capacity of the individual's arms and hand. In one hypothetical, the ALJ asked the VE to assume an individual with the following limitations: an ability to lift twenty pounds occasionally and ten pounds frequently; sit, stand, or walk for six hours in an eight-hour work day; occasional climbing, stooping, kneeling, crouching, and crawling; and *frequent* handling and fingering in the dominant hand and *occasional* handling and fingering in the non-dominant hand. (Tr. 65). The VE testified that the hypothetical individual would be capable of being an usher (5,000 jobs nationally) or bus monitor (14,000 jobs nationally). (Tr. 66). Notably, the VE testified that these were the only jobs that she could provide and that they were not simply illustrative of other jobs in the national economy that could be performed on full-time basis with these limitations. Altering that hypothetical, the ALJ's asked the VE to assume that the individual was limited to *occasional* handling in both hands. (Tr. 66). The VE testified that sufficient employment would not exist in that hypothetical. (Tr. 66). Again altering the second hypothetical, the ALJ posited a fourth hypothetical requiring that individual to lay down half of a work day. (Tr. 67). The VE testified that would eliminate both the bus monitor and usher jobs and that there were

no other job she could offer as examples. (Tr. 67).

Another sequence of hypotheticals varied both the number of hours an individual could stand or walk as well as the ability to handle and finger. The ALJ asked the VE to assume the ability of frequent handling and fingering with the dominant hand and only occasional with the non-dominant hand and to further assume the individual was capable of standing or walking up to four hours in an eight-hour workday. At that point, the testimony got confused but, after some clarification, the VE testified that the only job left that she could identify was that of a bus monitor. The limitation of being able to stand or walk for up to four hours in an eight-hour work day eliminated the usher position. (Tr. 67–70). Finally, the VE testified that, if the individual has manipulative limitations and is not able to stand or walk for up to four hours in an eight-hour workday, there would be no jobs available. (Tr. 68).

### E.    Other Evidence

While Wilkinson's spouse did not testify at the hearing, she did submit a detailed description of he husband's limitations, which was dated October 26, 2015. What she described was consistent with Wilkinson's testimony, including, particularly, her perceptions of his inability to stand or walk for any significant amount of time, the restrictions resulting from his wrist and arm impairments, and the fact that physical activity he is able to engage in is minimal, including only minimal household chores. (Tr. 238–245).

Assessments of Wilkinson's physical and mental RFC were made by state-agency consultants. These assessments will be addressed later as necessary.

### F.    ALJ's Decision

The ALJ stated that she evaluated Wilkinson's claim for disability by following the

established five-step sequential analysis for determining whether a person is disabled. (Tr. 11). At step one, the ALJ concluded Wilkinson had not engaged in substantial gainful activity since March 5, 2015—Wilkinson's amended disability onset date. (Tr. 13).

At step two, the ALJ concluded that Wilkinson's obesity, degenerative disc disease of the lumbar spine, bilateral carpal tunnel syndrome, radioscapholunate fusion of the left wrist with hardware removal, and left thumb carpometacarpal arthritis constituted severe impairments. (Tr. 13). The ALJ concluded Wilkinson's alleged mental impairments were not severe because, under the relevant regulations, Wilkinson had: (1) no limitation with understanding, remembering, or applying information; (2) mild limitation interacting with others; (3) mild limitation with concentrating, persisting, or maintaining pace; and (4) mild limitation with adapting and managing himself. The ALJ did not address any other impairment at step two. (Tr. 13–15).

At step three, the ALJ concluded that the combination of Wilkinson's impairments did not meet or medically equal the impairments listed at 20 C.F.R. § 404, Subpart P, Appendix 1. (Tr. 17).

At step four, the ALJ determined Wilkinson's residual functioning capacity. The ALJ noted Wilkinson had difficulty ambulating based upon his back and leg pain, but Wilkinson testified he could stand for up to thirty minutes to cook dinner on a normal day. (Tr. 18). The ALJ further noted Wilkinson's reports of limited manipulative capacity in his hands, citing Wilkinson's testimony that he could not use his left hand for various activities and he could use his right hand to pick up and hold objects. (Tr. 18). The ALJ concluded Wilkinson's medically determinable impairments could reasonably be expected to cause the symptoms Wilkinson reported. (Tr. 18).

The ALJ, however, concluded that the medical and other evidence did not support the extent of intensity, persistence, and limiting effect of those symptoms. (Tr. 18). The ALJ observed "there

is little medical support for the more restrictive limitations [Wilkinson] had noted." (Tr. 19). Although Wilkinson's ongoing pain rendered him no longer able to engage in medium to heavy exertional activity, such limitation did "not necessarily preclude him from work at all exertional levels" and "no treating or examining physician has made a definitive statement regarding permanent limitations." (Tr. 19). The ALJ noted Wilkinson generally appeared satisfied with his pain management for his back and legs consisting of prescription medication and physical therapy. The ALJ further noted Wilkinson's "wrist problems and carpal tunnel syndrome have limited his ability to handle and finger, but his left hand has been worse than his right, dominant hand." (Tr. 19). Continuing, the ALJ observed "there are minimal reports of issues with the right wrist" and Wilkinson "noted nothing significant in his right, dominant hand." (Tr. 19).

On the foregoing, the ALJ determined Wilkinson retained residual functioning capacity to perform less than a full range of light work, including the ability to: (1) lift or carry 20 pounds occasionally and 10 pounds frequently; (2) sit for 6 hours in an 8-hour workday and stand/or walk for 6 hours in that day; (3) frequent handling and fingering in the right, dominant hand and occasional handling and fingering with the left, non-dominant hand; and (4) occasional climbing, stooping, kneeling, crouching, and crawling. (Tr. 17). Completing step four, the ALJ concluded Wilkinson's residual functional capacity did not allow him to perform his past work. (Tr. 20).

At step five, the ALJ concluded Wilkinson's age, education, work experience, and residual functional capacity allowed him to perform jobs existing in sufficient quantities in the national economy—namely, an usher and bus monitor. (Tr. 21). With that, the ALJ concluded Wilkinson was not disabled within the meaning of the Social Security from March 5, 2015 through the date of her decision on February 9, 2017, rendering benefits unavailable to him. (Tr. 20–22).

## II.    GOVERNING LAW

### A.    Standard of Review

This court's review is limited to determining whether the record as a whole contains substantial evidence supporting the Commissioner's decision.  <u>Ellis v. Barnhart</u>, 392 F.3d 988, 993 (8th Cir. 2005) ("<u>Ellis</u>").  Substantial evidence is less than a preponderance, but more than a scintilla of evidence.  <u>Nelson v. Sullivan</u>, 966 F.2d 363, 366 n.6 (8th Cir. 1992) ("<u>Nelson</u>"); <u>Robinson v. Sullivan</u>, 956 F.2d 836, 838 (8th Cir. 1992).  It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Nelson</u>, 966 F.2d at 366 n.6 (quoting <u>Richardson v. Perales</u>, 402 U.S. 389, 401(1971)).  Under the substantial evidence standard, it is possible for reasonable persons to reach contrary, inconsistent results.  <u>Culbertson v. Shalala</u>, 30 F.3d 934, 939 (8th Cir. 1994).  Thus, the standard "embodies a zone of choice within which the [Commissioner] may decide to grant or deny benefits without being subject to reversal on appeal."   <u>Id.</u> Consequently, the court is required to affirm a Commissioner's decision that is supported by substantial evidence, even when the court would weigh the evidence differently and reach an opposite conclusion.  <u>Id.</u>

In conducting its review, the court is required to afford great deference to the ALJ's credibility assessments when the ALJ has seriously considered, but for good reasons has expressly discounted, a claimant's subjective complaints, and those reasons are supported by substantial evidence based on the record as a whole.  <u>See</u> <u>Haggard v. Apfel</u>, 175 F.3d 591, 594 (8th Cir. 1999); <u>Brockman v. Sullivan</u>, 987 F.2d 1344, 1346 (8th Cir. 1993).  The Eighth Circuit has stated, "Our touchstone is that a claimant's credibility is primarily a matter for the ALJ to decide." <u>Anderson v. Barnhart</u>, 344 F.3d 809, 814 (8th Cir. 2003).  Nonetheless, the court's review is more than a search

for evidence supporting the Commissioner's determination, as the court must carefully consider the entire record in deciding whether there is substantial evidence to support the Commissioner's decision, including evidence unfavorable to the Commissioner.  <u>Ellis</u>, 392 F.3d at 993.

**B.**     **Law Governing Eligibility for Adult Benefits**

An individual is "disabled" for purposes of DIB and Supplemental Security Income ("SSI") if the person is unable to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment that can be expected to result in death or that has lasted, or can be expected to last, for a continuous period of not less than twelve months.  <u>E.g.</u>, <u>Hilkenmeyer v. Barnhart</u>, 380 F.3d 441, 443 (8th Cir. 2004); <u>Pearsall v. Massanari</u>, 274 F.3d 1211, 1217 (8th Cir. 2001) "<u>Pearsall</u>"); <u>see</u> 42 U.S.C. §§ 423(d)(1)(A),  1382c(a)(3)(A).  In deciding whether a claimant is disabled, the ALJ must use the five-step sequential evaluation mandated by 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4)[2] and determine:

(1)     whether the claimant is presently engaged in a substantial gainful activity,

(2)     whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities,

(3)     whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations,

(4)     whether the claimant has the residual functional capacity to perform his or her past relevant work, and

(5)     if the claimant cannot perform the past work, the burden then shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.

If the ALJ reaches steps four or five, the ALJ must first determine a claimant's residual functional capacity ("RFC").   20 C.F.R. §§ 404.1545, 416.945.  The ALJ must make this

_____

[2]  The provisions in 20 CFR Part 404 apply to DIB and the provisions in Part 416 apply to SSI benefits.

determination based on all relevant evidence, including observations of treating physicians and the claimant's own subjective complaints and descriptions of limitations. <u>Pearsall</u>, 274 F.3d at 1218.

In evaluating a claimant's subjective complaints, the ALJ is required to assess the claimant's credibility in light of the objective medical evidence and "any evidence relating to: a claimant's daily activities; duration, frequency and intensity of pain; dosage and effectiveness of medication; precipitating and aggravating factors, and functional restrictions." <u>Id.</u>; 20 C.F.R. §§ 404.1529, 416.929. These factors are often referred to as the "<u>Polaski</u> factors" in that they originate with the Eighth Circuit's decision in <u>Polaski v. Heckler</u>, 739 F.2d 1320 (8th Cir. 1984). <u>E.g.</u>, <u>Ellis</u>, 392 F.3d at 993–996. Claimant's subjective complaints may be discounted only if found to be inconsistent with the record taken as a whole. <u>Pearsall</u>, 274 F.3d at 1218.

If the ALJ concludes at step four that the claimant lacks the RFC to be able to perform his or her past relevant work, the burden of producing evidence that the claimant has the RFC to perform other jobs shifts to the Commissioner. <u>Hensley</u>, 829 F.3d 926, 931–32 (8th Cir. 2016) ("<u>Hensley</u>"). However, "the burden of persuasion to prove disability and to demonstrate RFC remains on the claimant, even when the burden of production shifts to the Commissioner at step five." <u>Id.</u> (quoting <u>Goff v. Barnhart</u>, 421 F.3d 785, 790 (8th Cir. 2005) with alteration and quotation omitted).

## III.   <u>DISCUSSION</u>

Both Wilkinson and the Commissioner have moved for summary judgment. Wilkinson argues the record as a whole supports a finding of disability notwithstanding the ALJ's contrary conclusion. In the alterative, Wilkinson argues the court should remand this case because the ALJ did not properly determine at step two the severity of several of his claimed impairments and erred

later in assessing his RFC.  The Commissioner disagrees, arguing the record as a whole supports the

ALJ's disability determination and that the ALJ properly performed the necessary sequential

analysis, including at step two and later in the determination of Wilkinson's RFC.

### A.  The Lack of Evidence for the Finding of an Ability to Stand or Walk for Up to Six Hours in an Eight-Hour Workday

#### 1.  Introduction

The ALJ concluded as part of her RFC assessment that Wilkinson had the ability to stand

or walk for up to six hours of an eight hour work day notwithstanding his severe back impairment

that he contends prohibits him from functioning at this level.  While not discussing this benchmark

specifically other than as a conclusion, the ALJ points to certain evidence in the record, or perceived

lack of it, for her RFC assessment that includes this finding.  For the reasons that follow, the court

concludes that the "evidence" relied upon the ALJ is insufficient to support the finding of an ability

to stand or walk for six hours out of each eight-hour workday.

Before turning to what the ALJ concluded, some context is required.  Notably, this is not a

case where there is a lack of medical evidence supporting Wilkinson's complaints of back pain.

Here, there is indisputable objective evidence of degenerative changes in his lower back in the form

of repeated diagnostic imaging and his history of two back surgeries.  Further, while there might be

some question as to the exact cause of the pain that Wilkinson contends he is experiencing as well

as its intensity and disabling effects, his treating doctors have continued him on narcotic pain

medications—not blindly and under managed care.[3]  Further, his treating physician at the time of

ALJ hearing offered the opinion in his medical notes of "failed back syndrome."  Finally, while it

---

[3] There is nothing in the record indicating that Wilkinson was taking more prescription pain medication than was prescribed.  In the record of his last visit to Sanford for pain management prior to the hearing before the ALJ, there is a note stating that Wilkinson "appears to be taking the medication appropriately."  (Tr. 984).

is true that there is no medical *opinion* evidence in the record stating Wilkinson is not able to stand or walk for up to six hours in an eight-hour work day on a consistent enough basis to be able to perform jobs requiring that level of functionality in a competitive environment, Wilkins has presented substantial evidence in the form of his own testimony and the evidentiary statement of his spouse that he is not able to function at that level.

        **2.**        ***The requirements that the RFC assessment be based upon some medical evidence of the claimant's ability to function in the workplace and, on the whole, substantial evidence***

As noted earlier, if the ALJ proceeds to steps four and five, the ALJ is required to determine a claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and other medical care providers, the claimant's own description of his or her limitations, and layperson observations about the claimant's ability to function. But, while all relevant evidence must be considered, the determination of a claimant's RFC remains, at bottom, a medical question. For this reason, the ALJ's RFC assessment "'must be supported by some medical evidence of the claimant's ability to function in the workplace.'" Combs v. Berryhill, 878 F.3d 642, 646 (8th Cir. 2017) (quoting Cox v. Astrue, 495 F.3d 614, 617 (8th Cir. 2007)); Hensley, 829 F.3d at 932 (same).

The required medical evidence need not necessarily be in the form of a medical *opinion* of the claimant's ability to function. E.g., Hensley, 829 F.3d at 932 ("[T]here is no requirement that an RFC finding be supported by a specific medical opinion."). But, while medical opinion evidence is not a *per se* requirement, the Eighth Circuit has *repeatedly* stated an ALJ "may not simply draw his own inferences about plaintiff's functional ability from medical reports." Combs, 878 F.3d at 646 (quotation omitted); Strongson v. Barnhart, 361 F.3d 1066, 1070 (8th Cir. 2004) (same); McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000) (same); Lund v. Weinberger, 520 F.2d 782,

785 (8th Cir. 1975) (same); see also Pate-Fires v. Astrue, 564 F.3d 935, 946 (8th Cir. 2009) (concluding that the inferences drawn by the ALJ from the medical records in that case amounted to "playing doctor"—"a practice forbidden by law").[4]

### 3. The ALJ's apparent reliance upon misstated evidence and evidence taken out-of-context

In reaching the conclusion that Wilkinson would be able to stand or walk for up to six hours in an eight-work day, one of the things that the ALJ appears to have relied upon are purported statements by Wilkinson's treatment providers after his second lumbar surgery that he could start doing light or sedentary work as tolerated. More specifically, the ALJ stated:

> After his last lumbar surgery, in the summer of 2015, his treatment providers had restricted him to lifting no more than twenty pounds at a time, but they related that he could start doing light or sedentary work as tolerated (Exhibits 12F, pg. 25; 15F, pg. 7). These restrictions are actually consistent with the residual functional capacity established in this decision and were, at that time, expected to be temporary in nature.

(Tr. 19-20). The problem with these statements is that the cited references do not even come close

---

[4] There is a line of Eighth Circuit cases which can be read as suggesting that a medical opinion of a claimant's ability to function is required, except, perhaps, in those cases where the import of the evidence is so clear that even a layperson could assess the claimant's ability to function without one. See, e.g., Lauer v. Apfel, 245 F3d 700, 703–06 (8th Cir. 2001) ("Lauer") ("We believe that to determine Mr. Lauer's RFC, however, the ALJ had to address complex medical issues that could be resolved only with professional assistance...."); Hutsell v. Massanari, 259 F.3d 707, 711–12 (8th Cir. 2001) (citing Lauer for the proposition that a claimant's RFC is a medical question; quoting Lauer that "an ALJ is therefore 'required to consider at least some supporting evidence from a [medical] professional;'" and then observing that the Commissioner's arguments for why its own consultants' opinions should be discounted "serves only to highlight the fact that no medical opinion supports the ALJ's residual functional capacity determination."); Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000) ("What is not clear is how these impairments [back, knee, and some depression], which prevent Nevland from doing his past work, affect his residual functional capacity to do other work. In spite of the numerous treatment notes discussed above, not one of Nevland's doctors was asked to comment on his ability to function in the workplace. As Circuit Judge Richard S. Arnold said when he sat as a district court in Ford v. Secretary of Health and Human Services, 662 F.Supp. 954, 955 (W.D.Ark.1987): 'The key issue in this case is Ford's RFC. This is a medical question.'"). Subsequent cases appear to reject this reading of the Lauer-Nevland line of cases, confining some of the broader discussion in the cases to their particular facts. See, e.g., Cox v. Astrue, 495 F.3d at 619; Krogmeier Barnhart, 294 F.3d 1019, 1023–24 (8th Cir. 2002); see also Geer v. Berryhill, No. 4:17-cv-0196, 2018 WL 1508598, at *4 (W.D. Mo. Mar. 27, 2018) (noting the tension in the cases and concluding the Eighth Circuit "has recently clarified that "[some medical evidence] does not mean the ALJ is required to base the RFC determination upon a medical opinion.") (italics in original); Poitra v. Colvin, No. 4:14-cv-094, 2015 WL 9700337, at ** 22–29 (D.N.D. Nov. 30, 2015) (discussing the cases pre-Combs supra). Nevertheless, a certain tension remains between an ALJ not necessarily needing a medical opinion of the claimant's RFC on the one hand and the ALJ being limited in drawing his or her own inferences about a claimant's functionality from the medical reports on the other.

to supporting them, much less the finding at issue here, which is whether Wilkinson is capable of standing or walking for up to six hours in an eight-hour workday.

More particularly, the statement by one of Wilkinson's treating physicians at page 7 of Ex. 15F that "he may return to work light duty as tolerated" was made on June 25, 2014, which was *before* the second surgery and the continued problems that Wilkinson claimed he has after that surgery. In fact, Wilkinson did return to work after the first surgery, but concluded after his second back surgery he could not tolerate his old work because of continued pain in his back and claims now that, because of his severe back and arm impairments, he is disabled within the meaning of the law.

The statement in Exhibit 12D at p. 25, while made after the second surgery, is even more problematic. First, the statement appears to be the treatment provider recounting what Wilkinson had told the treatment provider rather than an opinion by the treatment provider. Second, the actual statement was that "he is going to start doing light duty, sedentary work as tolerated"—not light duty <u>or</u> sedentary work. And, as discussed later, there is a significant difference in this case as to whether Wilkinson was capable in view of his back condition of being able to perform light work as opposed to sedentary work, putting aside the limitations in wrists and forearems. Third, and even more significantly, the record in question was made a nurse practitioner who was doing a followup on Wilkinson's left wrist fusion. It was not made by any of the medical professionals that Wilkinson was seeing for his back problems, much less a treating physician. Fourth, there is no reason to believe that either Wilkinson or the nurse in question had in mind the functional ability to stand or walk for up to six hours in an eight-hour work day when the statement was made.

This is more than a minor opinion-writing error. Given the criticality of the ALJ's

determination that Wilkinson is able to stand or walk for up to six hours in an eight-hour work day as discussed later and the relative importance of a purported suggestion by a treating professional that a claimant could attempt to return to light work, even if only as tolerated, this error alone likely requires remand. This is because it is impossible to tell whether the ALJ would have made the same finding absent the problematic evidence. Cf. Brueggemann v. Barnhart, 348 F.3d 689, 695–96 (8th Cir. 2003) (error was not harmless when it was material to the denial of benefits and it could not be determined whether the ALJ would have reached the same decision absent the error).[5]

---

[5] This was not the only error bearing upon Wilkinson's ability to stand or walk. The ALJ also stated in her decision that Wilkinson testified "he thinks he could stand for up to thirty minutes or to cook dinner on a normal day." (Tr. 18). Wilkinson's actual testimony, however, was as follows:

Q.     Okay. And how long are you able to stand?
A.     It depends on the day. I mean, for instance, I got out yesterday and my wife wanted to go to the mall. And I walked into one store and I made maybe - - I was in there for five minutes and I was sitting down and I told her I got to go back out to the truck. Went to the motel, as you know, because we were snowed in and woke up this morning and it took me a good hour-and-a half to get out of bed. My back was hurting so bad - -
Q.     Yes.
A.     –I had to wait for my pills to kick in.
Q.     What about on maybe a more normal situation in your day-to-day life, how long can you stand when you're at home?
A.     *It kind of depends upon the day. I usually used to always cook dinner and that would take me a half-hour or longer you know, nothing fancy or elaborate. And now I can't even do that. I stand in there for five minutes and I'm heading back for the couch to sit down because my back starts hurting.*

(Tr. 53-54) (italics added). Later, Wilkinson responded to further questioning:

Q.     Okay, What else do you do when you're not laying on the couch?
A.     Well, I try to cook dinner. I try to get things going. You know, it's something I used to look forward to doing, but I really can't anymore. I mean, it's I just can't stand there and do it like I used to, but it usually takes me all day. If I'm going to make dinner for my wife and kids, which I feel it's the least I can do for them, it usually takes me all day. I have to start early, early in the afternoon because I'm constantly up and down off the couch.
Q.     What kinds of meals will you start in the afternoon to make?
A.     Simple. Really simple. I mean, noodles and Alfredo sauce or spaghetti or, you know, simple things.
Q.     What else do you do during the day?
A.     That's basically it.

(Tr. 56). Wilkinson then went on to testify that he currently does not do dishes, laundry, vacuuming, sweeping, lawn mowing, or snow removal because of the continuous standing and/or bending required. (Tr. 57). But, even putting aside the apparent error in characterizing Wilkinson's testimony, the ability to stand for a half-hour or so in a non-demanding environment when a break can be taken if need be is hardly indicative of an ability to stand or walk for up to six hours in an eight-hour work day consistently.

-23-

### 4.    The RFC assessments of the state agency consultants

Another piece of evidence that the ALJ appears to have relied upon for her conclusion that Wilkinson could stand or walk for up to six hours in an eight-hour workday are the assessments made by two state-agency medical consultants of Wilkinson's physical RFC—one by Dr. Thomas Christianson December 11, 2015, and the other by Dr. Ralph Kilzer April 21, 2016.    (Tr. 80–81, 95–96).  Both were paper assessments, *i.e.*, they were made by the physicians reviewing the records assembled by SSA without meeting Wilkinson and conducting a physical examination.

The SSA has instructed in 20 C.F.R. §§ 404.1513a and 404.1527(f) that an ALJ can consider the opinions of state-agency consultants as statements of a non-examining physician with expertise in Social Security disability evaluations.  Under the regulatory regime that applies to this case, these opinions are generally entitled to less weight than those of a treating physician.  See 20 C.F.R. § 404.1527 (limited now to claims filed before March 27, 2017).

In an appropriate case, the opinions of a non-examining medical consultant can be a basis for an ALJ's RFC assessment that  results in a finding of no disability.  See, e.g., Casey v. Astrue, 503 F.3d 687, 697 (8th Cir. 2007).  However, the Eighth Circuit has been skeptical of (and afforded little or no weight to) assessments by nonexamining sources when (1) the assessments simply recite the findings in a "checklist format" with little or no explanation for particular findings, and/or (2) the nonexamining consultant has not had access to all of the relevant records, including those that postdate the assessment.  See, e.g., McCoy v. Astrue, 648 F.3d 605, 615–16 (8th Cir. 2011) (discussing the cases).

In this case, the RFC assessments by the two nonexamining state agency consultants for the

most part are akin to the "check-a-box" assessments that the Eighth Circuit has been critical of in McCoy and other cases. In each of the two assessments, there is little explanation for the particular findings made and none with respect to the finding that Wilkinson retained the capacity to stand or walk for up to six hours in an eight-hour work day. (Tr. 80–81, 95–96). Further, both assessments predate a substantial amount of additional 2016 medical evidence that is relevant to Wilkinson's claim that he continued to have substantial back pain notwithstanding his two back surgeries—including his continuation on narcotic pain medication and Wilkinson's treating physician's diagnosis that he "has failed back syndrome."

Finally, the ALJ stated she accorded only "some weight" to the conclusions of the state agency consultants and it is impossible to determine from her opinion how much reliance, if any, she placed on their conclusions that Wilkinson retained the ability to stand or walk for extended periods of time such as would allow him to perform light as opposed to only sedentary work. While in other cases this might not be cause for concern, it is particularly problematic in this case given: (1) the problem of the ALJ facially relying upon phantom suggestions that Wilkinson could try to return to light duty work post after his second back surgery; (2) the conclusory assessments of the two state agency consultants and the fact they had not reviewed the most recent relevant evidence bearing upon his ability to stand or walk for a significant part of the work day; and (3) the lack of much, if any, credible *affirmative* medical evidence supporting the conclusion that Wilkinson retained the ability to stand or walk for up to six hours in an eight-hour work day as discussed next.[6]

---

[6] In addition to the two RFC assessments of Wilkinson's physical capabilities, there were two assessments by state-agency consultants of Wilkinson's mental impairments. As noted earlier, the one made by Dr. Kehrwald was based upon a review of the records and an in-person examination. Dr. Kehrwald stated in his report that Wilkinson would likely have trouble with aspects of endurance and may have trouble performing heavier physical work. The ALJ discounted these observations as being outside the area of his expertise. (Tr. 15). While the observations were outside of Dr. Kehrwald's expertise, they remain a third-party observation bearing upon Wilkinson's ability to function and add

## 5. *Conclusion of only "minimal treatment" following the second back surgery*

The ALJ also points to what she claims was Wilkinson seeking only minimal treatment for his back impairments following his second surgery. More particularly, she stated:

> The claimant underwent a laminectomy and decompression surgery on July 22, 2015, just four months after his amended onset date (Exhibits 9F, pg. 21; l0F). Afterwards, he was doing well with the pain, but it continued to come and go and he was referred to pain management (Exhibits 14F, pg. 8; 33F; 44F, pg. 1, 6). The claimant has been prescribed Oxycodone and Flexeril for his pain (Exhibits 9F, llF, 12F, l5F, l7F, 44F). *However, the record reflects minimal treatment after his last surgery, aside from the pain medications, up until October of 2016* (Exhibits 33F, 43F, 44F). *Had the claimant's back been bothering him on an ongoing basis as much as he alleged at the hearing, the undersigned would have expected to see reports that he was limited to spending 50% of his day laying down.* The claimant did report more significant back pain in the fall of 2016 and was advised to pursue physical therapy (Exhibit 44F, pg. 11, 18-22). However, this was the first appointment in which it had been noted that the claimant's pain was not controlled (Exhibit 44F, pg. 21). The next month, on November 21, 2016, he had reported an improvement with the physical therapy (Exhibit 44F, pg. 23, 26).

(Tr. 18). These observations are problematic in several respects.

First, while the ALJ described Wilkinson's treatment for his back impairments during the period following his second back surgery in July 2015 up to October 2016 as being minimal aside from the narcotic pain medications being prescribed, continued treatment on narcotic pain medication is hardly minimal. See, e.g., Cox v. Apfel, 160 F.3d 1203, 1208 (8th Cir. 1998) (consistent diagnosis of chronic pain coupled with a long history of pain management and narcotic drug therapy supported allegations of disabling pain); Shenk v. Berryhill, No. 8:17-cv-279, 2018 WL 4621739, at *8 (D. Neb. Sept. 26, 2018) (prescriptions for narcotic pain medication supported claim of disability); Baldwin v. Berryhill, No. 3:16-cv-00341, 2017 WL 6055383, at *4 (E.D. Ark. Dec. 7, 2017) (consistent treatment with strong narcotics part of the evidence relied upon to find disability); cf. Smith v. Colvin, 756 F.3d 621, 626 (8th Cir. 2014) (the fact that the claimant did *not*

---

weight to the court's concern about the sufficiency of the evidence supporting the ALJ's RFC assessment.

-26-

take narcotic pain medications for relief  supported ALJ's conclusion that he did not have work disabling limitations); Goodale v. Halter, 257 F.3d 771, 774 (8th Cir.2001) (ALJ reasonably discredited a claimant's testimony about disabling pain based in part upon the fact that she was taking nothing stronger than over-the-counter medications to alleviate her symptoms).  Further, after Wilkinson recovered from the immediate impacts of the second back surgery, he was seen in person at least five different times for management of his back pain by either his treating physician or the physician's certified nursing assistant, including December 2, 2015 (Tr. 951–58); April 7, 2016 (Tr. 959–63); July 28, 2016 (Tr. 964–68); August 19, 2016 (Tr. 969–72); October 18, 2016 (Tr. 976–80); and November 21, 2016 (Tr. 981–85).[7]  On each of Wilkinson's  followup visits for the management of his lower back pain, there was a detailed physical examination and decisions made with request to the course of treatment, which, in each case, included continuation on narcotic pain medications.  Also, during this time frame, Wilkinson reported  (1) he always had back pain that was moderated to some degree by the regime of opiate medication he was on until October 2016 when he reported the pain as getting worse, and (2) that his pain levels would increase with attempts at increased physical activity, including walking longer and extended periods of sitting and standing. Further, it was in the report of the August 19, 2016 followup examination that Wilkinson's treating physician made the comment of Wilkinson having "failed back syndrome."

Second, in addition to the treatment in this court's estimation being more than "minimal," the ALJ makes two inferences—one of top of the other—for which there is little support in the record, medical or otherwise.  The first inference is that some other meaningful treatment was

---

[7]  While not entirely clear, the number of visits may have been greater had Wilkinson in the first half of 2016 not had the continued problems with his left wrist that required an additional surgical procedure and a period of recovery.

available in this case, such that the absence of treatment is in indeed material and relevant. Notably, the ALJ never identified what that treatment might be and the record reflects that Wilkinson had likely exhausted his surgical options. The second inference is that the absence of the unidentified further treatment is indicative of an ability on the part of Wilkinson to function at the level the ALJ assumed, including particularly his ability to stand or walk for up to six hours in an eight-hour work day. While the lack of treatment might be a legitimate point in support of an RFC determination in a case where the medical picture is not as complex, *e.g.*, a case of claimed low back pain for which there has been little treatment and the supporting objective signs are few, the inferences drawn by the ALJ here from what she characterized (and probably incorrectly) as "minimal treatment" appear to be of the nature that is prohibited by the long line of Eight Circuit precedent cited earlier. The same holds true for the ALJ's comment that she would have expected to see reports that Wilkinson was limited to spending 50% of his day laying down if his back condition was bad as he claimed.[8]

### 6. *The lack of a treating professional imposing permanent restrictions*

Finally, while again not alluding specifically to the conclusion that Wilkinson was capable of standing or walking for up to six hours in an eight-hour workday, the ALJ also stated:

> As for the opinion evidence, given his allegations of totally disabling impairments, one would expect to see some statement in the treatment records of permanent restrictions placed on the claimant by a treating physician. However, no treating or examining physician has made a definitive statement regarding permanent limitations.

(Tr. 19). The Eighth Circuit has held that an ALJ may consider the lack of any limitations placed upon a claimant's functioning by a treating physician in assessing a claimant's RFC. See, e.g.,

---

[8] In the undersigned's view, this is no more probative than the undersigned concluding he would have expected to see an ALJ limitation on standing or walking of less than four hours in an eight-hour work day on a sustained basis in a competitive environment—essentially limiting the claimant to sedentary work assuming no other disqualifying limitations—based upon having reviewed prior ALJ decisions in cases of comparable evidence, both medical and non-medical.

Hensley, 352 F.3d at 356 (considering the fact that few if any functional limitations were placed on the claimant by his treating physicians in a case where the ALJ had to decide which medical opinion testimony was more credible); Smith v. Shalala, 987 F.2d 1371, 1375 (8th Cir. 1993) (considering the lack of any express limitations imposed by claimant's doctors together with claimant's extensive active daily schedule). However, in most if not all of these cases, there was other affirmative medical evidence supporting the assessment. Id.; see also Nash v. Commissioner, SSA, __ F.3d __, 2018 WL 5725200, at *2 (8th Cir. 2018) ("Nash") ("While at least three doctors documented Nash's back pain, her medical records do not include any directions to lie down and prop up her feet [as the claimant contended she had to do]. True, Dr. Dooley recommended she avoid bending, squatting, or prolonged standing or walking, but he also wrote she "should be able to sit, hold a conversation, respond appropriately to questions, carry out and remember instructions."). Further, in at least one case, the Eighth Circuit has held that a treating physician's silence on the issue of work capacity did not constitute substantial evidence when the physician was not asked to opine on the matter and the claimant was not discharged from treatment. Hutsell v. Massanari, 259 F.3d 707, 712–13 (8th Cir. 2001).

In this case, after discounting what little affirmative medical evidence the ALJ purports to have relied upon for the reasons set forth above, there is little, if anything, left to satisfy the requirement that the RFC determination be based upon (1) some medical evidence that (2) reflects upon the claimant's ability to function in the workplace. Under these circumstances, the court concludes that any reliance upon the "negative evidence" of the treating physician's not having imposed any permanent restrictions is not enough to satisfy the "some medical evidence of claimant's ability to function in the workplace" threshold. This is particularly true here where the

treating physician continued to treat Wilkinson and there are reasons for why the physician did not impose restrictions, including that he was not contemporaneously asked and there was no particular reason for him to do so given that Wilkinson already was not doing much in the way of sustained physical activity.

### 7. *Lack of "some medical evidence supporting the ALJ's RFC determination" and overall lack of substantial evidence*

The court concludes for the reasons set forth above that there is lacking *sufficient* "some medical evidence bearing upon Wilkinson's ability to function in the workplace" to support the ALJ's RFC determination as it relates to his ability to stand or walk for up to six hours in an eight-hour work day. Further, even to the extent the ALJ could take into consideration some of the flawed evidence discussed above, it cumulatively, along with the non-medical evidence, does not in this court's estimation amount to the substantial evidence required to support the conclusion that Wilkinson retained the ability to stand or walk for up to six hours in an eight-hour workday.

### 8. *The non-medical evidence*

What Wilkinson and his spouse have stated about his limited functionality is consistent with his claim that he is not able to stand or walk for up to six hours in an eight-work day given his back severe back impairment. While the ALJ discounted to a degree what Wilkinson and his spouse claimed were his limitations, none of what the ALJ concluded moves the needle in terms of there being substantial evidence to support the level of the ability to stand or walk that she found. The ability to perform nontaxing household chores, walk or stand for limited amounts of time without rest, and drive a vehicle short distances is not inconsistent with a person being disabled, much less here the inability to stand or walk for up to six hours a day—which, absent other impairments would not foreclose an ability to perform sedentary work. See, e.g., Nowling v. Colvin, 813 F.3d 1110,

-30-

1111–12 (8th Cir. 2016) ("Participation in activities with family or activities at home and at 'your own pace' may not reflect an ability to perform at work."); Tilley v. Astrue, 580 F.3d 675, 681 (8th Cir. 2009) ("[The claimant's] ability to engage in some life activities, despite the pain it caused her, does not mean she retained the ability to work as of the date last insured."); Reed v. Barnhart, 399 F.3d 917, 923 (8th Cir. 2005) ("Moreover, it is well-settled law that a claimant need not prove [he] is bedridden or completely helpless to be found disabled.") (internal quotation marks and citation omitted); Banks v. Massanari, 258 F.3d 820, 832 (8th Cir. 2001) ("How many times must we give instructions that [watching television, visiting friends, and going to church] do not indicate that a claimant is able to work full time in our competitive economy?"); Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000) ("This court has repeatedly stated that a person's ability to engage in personal activities such as cooking, cleaning or a hobby does not constitute substantial evidence that he or she has the functional capacity to engage in substantial gainful activity.").

Of course, there are cases where the performance of household chores has been held to be some evidence of an ability to function at a particular level. See, e.g., Nash, 2018 WL 5725200, at *2 (claimant's ability to visit friends several times a week and, perform personal tasks, housework, and errands undermined her claim that she was unable to perform even sedentary work); Wagner v. Astrue, 499 F.3d 842, 851–853 (8th Cir. 2007) (discussing the cases). But context is everything—including the functional limitation in question and the nature of the household chores and other activity. In this case, the cooking, the limited and relatively non-taxing household chores, and the family activities are plainly not inconsistent with lack of an ability to stand or walk for up to six hours per day, day-in-and-day-out in a competitive environment.

### 9.    *The Commissioner's arguments*

In defense of the ALJ's determination that Wilkinson retained the ability to stand or walk for up to six hours in an eight-hour work day, the Commissioner points to some of the purported "negative evidence" that the court has concluded does not either alone or together with the other evidence satisfy either of the two thresholds discussed above.  Beyond that the Commissioner points to isolated points in the medical record, *e.g.*, the ability on a particular day to climb a flight of stairs or arise from a seated position—most of which were not mentioned by the ALJ, and asks this court to draw its own inferences as to the significance of these points to reach the conclusion there is substantial evidence supporting the ALJ's conclusion that Wilkinson retained the ability to stand or walk for up to six hours in an eight-hour day working day-in-and-day-out in a competitive environment.  The court declines this invitation, concluding the undersigned is no more qualified to draw the required inferences than the ALJ given the complexity of the medical condition.  Finally, the Commissioner also points to the fact that Wilkinson was able to do some cooking and a few other light household chores and non-taxing family activities.  The court has already addressed this point.

### 10.    *The unsupported conclusion that Wilkinson could stand or walk for up to six hours in an eight-hour work day was not harmless error*

As noted earlier, the VE testified that the only two jobs she could identify that Wilkinson would be able to perform based upon an RFC that included Wilkinson being able to stand or walk for up to six hours of an eight-hour work day was that of an usher and bus monitor given Wilkinson's other impairments.  The VE then went on to testify that, if Wilkinson was able to stand or walk for only four hours out of an eight-hour work day that would eliminate the job of usher leaving only the job of bus monitor.  If at the end of the day there is substantial evidence to support

-32-

this conclusion but not the ability to stand or walk for up to six hour in an eight-hour work day, there might be legitimate questions whether the available employment base has been so eroded with only one type of job being available that the Commissioner would not be able to meet her burden at step five of demonstrating that there are sufficient jobs in the national economy that the claimant can perform. <u>See</u>, <u>e.g.</u>, <u>Johnson v. Chater</u>, 2018 F.3d 178, 180 (8th Cir. 1997) (noting the one job testified to by the VE in that case was simply an example of other sedentary jobs the claimant would be able to perform); <u>Allino v. Colvin</u>, 83 F.Supp.3d 881, 886–90 (N.D. Cal. 2015) (the ALJ failed at step five to produce evidence that significant jobs existed in the local or national economy). Further, if it is ultimately determined that Wilkinson is able to stand or walk consistently for less than four hours out of a six hour work day, the VE testified that the final job of bus monitor would also be eliminated. This would render Wilkinson disabled given that the potential sedentary jobs Wilkinson would be able to perform with this limitation having been eliminated as a consequence of his other impairments.

**B.      The failure to address the diagnosis of ulnar impact syndrome in right wrist at step two**

*1.  Failure to address at step two*

At step two of the five-step sequential analysis, the ALJ is *required* to consider the medical severity of the claimant's impairments. See 20 C.F.R. § 404.1520(a)(4)(ii), 404.1520(c); Social Security Ruling ("SSR") 96-3p. While the claimant bears the burden of demonstrating that an impairment is severe, the burden "at this stage of the analysis is not great." <u>Caviness v. Massanari</u>, 250 F.3d 603, 605 (8th Cir. 2001). This is because the impairment need not be life-threatening or crippling at step two to be severe. Rather, an impairment is deemed severe if it is more than slight and more than minimally affects a claimant's ability to perform basic work activities qualifies. <u>See</u>

id; Siemers v. Shalala, 47 F.3d 299, 301 (8th Cir.1995); Householder v Bowen, 861 F.2d 191,192

n.1 (8th Cir. 1988); Westphal v. Colvin, No. 2:15-cv-02005, 2015 WL 6511322, at *3 (W.D. Ark.

Oct. 28, 2015).

In terms of the ALJ's responsibilities at step two, Social Security Ruling (SSR) 96-3p states

in relevant part:

> In determining the severity of an impairment(s) at step 2 . . . evidence about the functionally
> limiting effects of an individual's impairment(s) **must be evaluated** in order to assess the
> effect of the impairment(s) on the individual's ability to do basic work activities. . . . A
> determination that an individual's impairment(s) is not severe requires **a careful evaluation**
> of the medical findings that describe the impairment(s) (i.e., the objective medical evidence
> and any impairment-related symptoms), and an informed judgment about the limitations and
> restrictions the impairment(s) and related symptoms(s) impose on the individual's physical
> and mental ability to do basic work activities.

> **** Because a determination whether an impairment(s) is severe **requires** an
> assessment of the functionally limiting effects of an impairment(s), symptom-related
> limitations and restrictions must be considered at this step of the sequential evaluation
> process, provided that the individual has a medically determinable impairment(s) that could
> reasonably be expected to produce the symptoms.

(emphasis added) (citation omitted).

In this case, the ALJ summarily concluded Wilkinson's obesity, degenerative disc disease

of the lumbar spine, bilateral carpal tunnel syndrome, radioscapholunate fusion of the left wrist with

hardware removal, and left thumb carpometacarpal arthritis qualified as severe impairments. (Tr.

13). The ALJ continued by engaging in an extensive discussion as to why Wilkinson's alleged

mental impairments, specifically his alleged depression, did not constitute a severe impairment. (Tr.

13–15). The ALJ's analysis promptly ended at that conclusion and did not consider whether any

impairment of Wilkinson's right wrist other than his carpal tunnel syndrome did or did not qualify

as a severe impairment at step two. (Tr. 15). This omission occurred despite the medical reports

and testimony evidencing the presence and limitations of an impairment in the right wrist beyond

carpal tunnel syndrome.

When Wilkinson saw his treating physician for a followup examination after his left wrist fusion on March 5, 2015 , the treating physician noted the following with respect to the right wrist:

> His right wrist continues to give him some trouble, as well. He apparently underwent a radial shortening osteotomy some years ago. The reason is unknown. *He has developed, again, progressive difficulty with his right wrist.*

(Tr. 353) (emphasis added). During the same visit x-rays were taken of the right wrist and the treating physician noted as part of his objective findings that the x-rays revealed the presence of "significant ulnar positive variance" and "significant radiolunate arthritis." (Tr. 353, 612). More specifically, the treating physician stated:

> X-rays of the right wrist were taken today, which do show that he has *significant ulnar positive variance. He has got deformity of the radius, as well as significant radiolunate arthritis.*

(Tr. 353). Then again, a year later, when Wilkinson was being evaluated for another surgery on the left wrist, the same treating physician noted the following as part of his physical examination:

> Examination of his right wrist, he has a prominent ulna. Tenderness over the DRUJ. *Pain with any range of motion at all. He has limited motion.* Reasonable strength and sensation.

(Tr. 812) (emphasis added). He then went on to add as part of his assessment:

> Regarding his right, again, *if he continues to have problems, we would like to do something that can preserve motion.* Again, he may be a candidate for a proximal row carpectomy and Sauve-Kapandji fusion like he had on his other side. I think that will again maintained [sic] *some* motion and give him a little bit more of longevity with his wrist.

(Tr. 813) (italics added).

In addition, Wilkinson testified at the administrative hearing that, while his treating physician had advised he may need surgery to preserve some motion in his right wrist and hand, he was trying to avoid surgery to maintain what articulation remained, marginal as it may be. (Tr. 51–52). When asked about the articulation that would be lost after surgery, Wilkinson testified he would no longer

"be able to wipe himself" because he could "barely do it with what little movement I have on this hand now." (Tr. 51). He also testified that, although he might be able to use a wrench with his right hand, he could do so only momentarily before the wrist started swelling, (Tr. 60), and his right wrist was "swollen up all the time too." (Tr. 51).

In short, far from there being "minimal reports of issues with the right wrist" and Wilkinson "not[ing] nothing significant in his right, dominant hand," it is clear from the foregoing excerpts that (1) Wilkinson did complain about pain and limited motion in his right wrist contemporaneously to his treating physician and again during the hearing before the ALJ, and (2) his treating physician diagnosed significant lunate facet arthritis with ulnar impaction syndrome as being a contributing source of pain and limited motion.

**2.     *The failure to address at step two requires remand***

The Commissioner in her brief makes a half-hearted argument that there was no error at step two, contending that the ALJ found severe bilateral upper extremity impairments and that, at one point in her decision, she made reference to both wrist problems and carpal tunnel syndrome. However, "severe upper extremity impairments" are the Commissioner's words and not those of the ALJ. What the ALJ concluded at step two was that Wilkinson had carpal tunnel syndrome in both hands, which she classified as severe, and an additional wrist impairment in the left hand, which she also classified as severe. The ALJ never identified in her opinion any impairment in Wilkinson's right wrist or forearm other than carpal tunnel syndrome and it appears that ulnar impaction syndrome and carpal tunnel syndrome are not the same thing.

As for the vague reference by the ALJ to Wilkinson's wrist problems and carpal tunnel syndrome, this was not part of her step two discussion and the separate reference to "wrist problems"

-36-

most likely refers to the impairments in Wilkinson's left wrist for which she did treat as severe both the carpal tunnel and the fact he had surgery to address the positive ulnar variance in that hand. In other words, contrary to the Commissioner's argument, there is nothing that credibly suggests the ALJ considered and deemed severe the treating physician's diagnosis of ulnar impaction syndrome in Wilkinson's right wrist given that she (1) made no specific mention of this impairment, (2) specifically referenced a similar impairment in the left wrist that she deemed severe in addition to carpal tunnel syndrome, and (3) affirmatively stated that the record reflected "nothing significant in his right, dominant hand."

The Commissioner then goes on to argue that any error at step two was harmless because the ALJ recognized that Wilkinson had some impairment in his right wrist and reflected that in her RFC determination. The court disagrees that this cures the error at step two for several reasons. First, it is not at all clear that the failure at step two can be cured in the manner suggested by the Commissioner. See, e.g., Nicola v. Astrue, 480 F.3d 885, 887 (8th Cir. 2007) (reversing and remanding, in part, because the ALJ failed to consider a claimant's limited intellectual functioning, which was supported by sufficient evidence, at step two); Alberts v. Colvin, Case No. 3:15-cv-00046 (D.N.D. March 4, 2016); see generally 69 Am. Jur. 3d Proof of Social Security Disability Claim § 26 (2002) (noting an ALJ's failure to "make a finding on each impairment's severity will cast the entire decision in question.").

Second, the lack of any meaningful discussion of (1) the diagnosis of significant lunate facet arthritis with ulnar impaction syndrome in Wilkinson's right wrist based upon x-ray evidence and his physical examination, (2) the treating physician's findings upon examination that Wilkinson's motion in his right wrist was restricted as a result, and (3) the treating physician's implicit

conclusion that he found Wilkinson's pain complaints to be consistent with the physical evidence and credible, calls into question whether the ALJ accurately assessed the degree of Wilkinson's right wrist functioning and properly reflected that in her RFC determination.

Third, Wilkinson's right wrist impairments, when considered in conjunction with his other impairments and the VE testimony, are potentially dispositive of his claim for disability. As discussed earlier, if it is assumed that level of Wilkinson's ability to handle and finger with his right hand is occasional rather than frequent, the VE was unable to identify any jobs Wilkinson would be able to perform in the national economy.

### C.    Other Claimed Errors

Wilkinson contends that the ALJ erred by not concluding at step 2 that his claimed mental impairments were not severe. While the undersigned might have reached a different conclusion given the low threshold of "severity" for purposes of step two, the ALJ did explain in detail the basis for her conclusion that the mental impairments were not severe. And, after careful review, the court concludes with respect to this point that the ALJ's decision was not clearly in error.

Wilkinson further contends that the ALJ erred by not including as severe impairments at step two Wilkinson's (1) chronic back pain, (2) chronic left wrist pain, (3) failed back syndrome, and (4) bilateral lower extremity radicular pain. Unlike the situation with respect to the ulnar impaction syndrome in the right wrist that appears to be different from the carpal tunnel syndrome, these impairments are subsumed in ones that the ALJ did treat as severe or, in the case of the right wrist, also subsumed in the one the ALJ failed to address, likely should have treated as severe, and that needs to be addressed upon remand. That being the case, the ALJ did not error in failing to separately treat as severe at step 2 these impairments. Gregory v. Commissioner, SSA, __

Fed.Appx.__, 2018 WL 3486885, at *3 (8th Cir. July 19, 2018) ("Our precedent indicates that the failure to list a specific impairment at step two is not an error unless the impairment is 'separate and apart' from the other listed impairments."); Gragg v. Astrue, 615 F.3d 932, 939 (8th Cir. 2010) (concluding there was no error at step two given that "[n]othing in the record indicates that the pseudoaneurysm and the aortic root abscess are separate and apart from the listed heart health issues that the ALJ considered.").

Finally, Wilkinson claims that the ALJ erred by failing to reach out to one or more of his treating physicians for an opinion with respect to his ability to function, particularly when she became aware that Wilkinson had attempted to get an opinion from one of the treating physician for his right hand but could not afford the $500 fee for the opinion. "Well-settled precedent confirms that the ALJ bears a responsibility to develop the record fairly and fully, independent of the claimant's burden to press his case." Combs, 878 F.3d at 646 (internal quotations and citing authority omitted). Nevertheless, an "ALJ does not have to seek additional clarifying statements from a treating physician unless a crucial issue is undeveloped." Id. at 647 (internal quotations and citing authority omitted).

In this case, the court's conclusion that there is insufficient evidence to support the ALJ's RFC determination with respect to Wilkinson's ability to stand or walk for up to six hours in an eight-hour work day likely requires further development of the record with respect to that issue. But, whether that is done by seeking an opinion from the treating physician or in some other manner—such as having some other qualified physician provide an RFC assessment based on a physical examination or functional testing—must be left to the discretion of the ALJ upon remand. The same *may* also be true for Wilkinson's right wrist impairments.

### D.     Remand for Further Proceedings

Because the court has concluded that the ALJ has erred, this case will be remanded pursuant to sentence four of 42 U.S.C. § 405(g).  Buckner v. Apfel, 213 F.3d 1006, 1010 (8th Cir. 2000) ("A sentence four remand is therefore proper whenever the district court makes a substantive ruling regarding the correctness of a decision of the Commissioner and remands the case in accordance with such a ruling.").   Wilkinson argues  that the evidence is so one-sided that the remand should be for an award of benefits.  The court disagrees.  Hence, the remand will be for further proceedings consistent with this opinion. Id. at 1011 (remand with instructions to award benefits is appropriate "only if the record overwhelmingly supports such a finding.") (internal quotations and citing authority omitted).

## IV.     <u>CONCLUSION</u>

Based on the foregoing, the court **GRANTS IN PART** and **DENIES IN PART** Wilkinson's Motion for Summary Judgment.  (Doc. No.  13).  The court also **DENIES** the Commissioner's Motion for Summary Judgment.  (Doc. No. 15).  The Commissioner's decision is **REVERSED** and **REMANDED** for further proceedings consistent with this opinion.

**IT IS SO ORDERED.**

Dated this 15th day of November, 2018.

*/s/  Charles S. Miller, Jr.*
Charles S. Miller, Jr., Magistrate Judge
United States District Court